UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STUART DIAMOND,                                      :

                         Plaintiff,                 :        05 Civ. 1937   (PAC)

             - against -                        :        MEMORANDUM
                                    OPINION & ORDER

TREASURERS AND TICKET SELLERS UNION       :
LOCAL 751 PENSION FUND, THE TRUSTEES OF
OF THE TREASURERS AND TICKET SELLERS      :
UNION LOCAL 751 PENSION FUND, and
ROBERT CLEARY,                            :

                       Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        HONORABLE PAUL A. CROTTY, United States District Judge:

        Plaintiff Stuart Diamond filed this lawsuit under the Employee Retirement Income

and Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., alleging improper denial of pension

benefits and breach of fiduciary duty.  Plaintiff names as defendants the Treasurers and Ticket

Sellers Union Local 751 Pension Fund,[1] (the "Plan" or "Fund"), the Fund's Trustees, and Robert

Cleary, the former union president and fund manager.  Now that discovery is complete, Defendants

move for summary judgment on all seven claims alleged in Diamond's Complaint.  Diamond

opposes Defendants' motion and cross-moves for summary judgment in his favor.

## BACKGROUND

        The Fund is a multiemployer pension plan that is co-sponsored by the Treasurers

and Ticket Sellers Local 751 and contributing employers who are parties to collective bargaining

---

[1] The correct name of the Fund is "Treasurers and Ticket Sellers Local 751 Pension Fund."

agreements with the Union.[2] (Affirmation of Sara Corello ("Corello Aff."), Ex. 2.)  The Fund is administered by a Board of Trustees, which is comprised of three Trustees representing the Union, and three Trustees plus one alternate Trustee representing contributing employers. (Id., Ex. 2, at D000732-000733.)  Defendant Robert Cleary ("Cleary") served as a Trustee and Manager of the Fund until November 3, 2003, when he resigned from his position as President of Local 751. (Id., Ex. 3.)

Union members, all of whom are treasurers and ticket sellers for theaters and events in the New York metropolitan area, qualify for pension benefits through the Plan by accruing service credits for each year of employment.[3] (Id., Ex. 1, at D000010.)  Service credits are awarded, in full or half units, for a specified amount of covered employment.[4] (Id., Ex. 1, at D000013.) Under the Plan, a union member accrues pension credits according to the following schedule:

- less than 60 days of covered employment = 0 pension credits
- 60-99 days of covered employment = ½ year of pension credit
- 100 or more days of covered employment = 1 full year of pension credit

(Id.)  A union member cannot earn more than one full pension credit in a given year. (Id.)

Under the Plan's rules, a union member with fifteen service credits is eligible for a "normal pension" after the age of 62, or may opt for early retirement benefits beginning at the age of 57.[5] (Id., Ex. 1, at D000061-000064.)  Union members with fewer than fifteen service credits

---

[2]  Local 751 of the Treasurers and Ticket Sellers Union is part of International Alliance of Theatrical Stage Employees.

[3]  The plan year is keyed to the fiscal year, and therefore runs from September 1 of one year to August 31 of the next year.  Thus, for example, days of covered employment worked in November 1997 would be credited to the 1998 plan year.

[4]  Covered employment is defined in the Plan as employment for which an employer is obligated to make contributions to the Fund. (Corello Aff., Ex. 1, D000051, D000056.)

[5]  Early retirement is equal to the amount of a Normal Pension, less 5/9 of 1% for each month that the employee is less than 62 years of age at the time the Fund begins paying the benefit. (Corello Aff., Ex. 1, at D000062.)

may still qualify for a Vested Pension when they reach 62 years of age. (Id., Ex. 1, at D000063.)

### 1. Diamond's History as a Union Employee

Plaintiff Stuart Diamond ("Diamond") joined Local 751 in 1966 (Affirmation of Stuart Diamond ("Diamond Aff.") ¶ 2); and participated in the Local 751 pension plan. Between 1966 and 1972, Diamond earned six full years of service credit towards the pension plan. In 1972, Diamond moved to California, where he stayed until 1981. (Id. ¶ 4.) His employment in California fell outside of Local 751's jurisdiction, so Diamond received no service credit for these 9 years. (Id.)

Diamond returned to New York in 1981, and resumed working within the jurisdiction of Local 751.The Fund credited Diamond with ninety-five days of covered employment during the 1982 plan year, resulting in only a half-year of pension credit. (Id. at ¶ 6.) From 1983 to 1997, Diamond received one full service credit towards the Local 751 pension plan each year, except during the 1984 plan year, for which he received no service credits. (Corello Aff., Ex. 6.)

In late 1997, Diamond worked as a ticket seller for the Christmas show at Radio City Music Hall ("Radio City"), a covered employer. On December 22, 1997, Diamond's drawer at a Radio City ticket window was found to be short of cash; and Radio City terminated Diamond's employment.[6] (Diamond Aff. ¶ 14-26.) Immediately after the Radio City incident, Diamond contacted Ron Argenzio ("Argenzio"), a treasurer for whom he had previously worked, and asked for a job. (Id. ¶ 28; Argenzio Dep. 49:21-50:21.) At the time, Argenzio worked as the treasurer for

---

[6] Diamond claims that further investigation revealed that the $1,075 shortage in his cash drawer was due to tickets that had not yet been returned to the computer and to his paycheck, which he had cashed at the drawer (a practice that Diamond claims was acceptable within the industry). Thus, Diamond claims that the entire incident was just a misunderstanding, and that the Union, particularly Cleary, knew this. (Diamond Aff. ¶¶ 22-26.)

various shows at the Javits Center. (Argenzio Dep. 52:10-19.)  He hired Diamond to work the Stella Management Show at the Javits Center for two days in January 1998.  This was Diamond's last job under the jurisdiction of Local 751.

Argenzio also offered Diamond a job working the NBA Spectacular at the Javits Center in February 1999, which would have been a four or five day job. (Id. 52:10-15, 53:23-54:6.) When Argenzio called Local 751 to get additional names from the work list,[7] however, Cleary told Argenzio that he did not want Diamond working the show. (Id. 54:12-55:15.)  Cleary did not give a precise reason for this, other than referring to the "trouble at Radio City." (Id. 55:11-15, 56:9-22.) As a result of this conversation, Argenzio called Diamond and told Diamond that he could not work the NBA Spectacular.[8] (Id. 58:7-13.)

Diamond went to the union office and confronted Cleary, demanding to know why Cleary would not let him work.  According to Diamond, Cleary responded: "Because nobody wants you." (Diamond Aff. ¶ 35.)  Diamond claims that this statement was false, however, as he was repeatedly told by Argenzio that he would hire Diamond for shows at the Javits Center were it not for Cleary's demand that he be taken off the work list. (Id.)

Argenzio's deposition testimony supports Diamond's version of the facts.  Argenzio

[7] The "work list" is a list maintained by Local 751 of all union members currently in search of covered employment.  An employer in need of extra labor would usually call Cleary, in his capacity as Union President, and get names off the list.

[8] Diamond claims that he went to the NBA Show in February and saw non-union employees working the show.  Nonunion employees are to be hired only if there are not enough union employees on the work list to fill positions.  Given that Diamond wanted to work and had asked Cleary to place his name on the list, Diamond should have been able to work the show.  Diamond tried to speak with Cleary, but was unable to get Cleary on the telephone.  Diamond then called another union representative, who told Diamond that he was not on the work list, which Diamond said was "strange" because Diamond had already asked to be placed on the list.  Diamond told the representative to make sure that his name was on the work list for future shows.

testified that he had at least "three, maybe four" conversations with Cleary about hiring Diamond for shows, but each time Cleary told Argenzio that he did not want Diamond hired.[9] (Id. 60:22-61:4, 62:2-4, 63:18-25.)  It appears that other treasurers were also told not to hire Diamond, as Argenzio knew of at least one other Javits Center treasurer who passed up Diamond for a show without explanation. (Id. 59:8-60:15.)  Cleary told Argenzio not to hire at least one other union member for Javits shows. (Id. 61:19-63:10.)  As with Diamond, Cleary did not explain to Argenzio why he did not want the other man hired. (Id.)

Diamond alleges that when he met with Cleary in 1998 about getting work, he also asked Cleary about his pension benefits and how many days he had.  Diamond claims that Cleary told him he had enough days to get his benefits, so he should not worry about it, stating: "If a guy is short a couple of days, I can give it to him, I've done it before." (Diamond Aff. ¶ 38.)  Diamond also claims that Cleary affirmed this advice in later conversations. (Id.)

Diamond wrote at least two letters to the Union demanding to see his pension records, but, according to Diamond, Cleary refused to provide them. (Id. ¶¶ 43, 48-49 & Exs. 5-6.)  While Cleary sent Diamond his pension credit card and a computer-generated printout of his service, he would not permit Diamond to visit the Fund office to examine additional records. (Id. ¶¶ 50-51 & Exs. 5-6.)  Larry Waxman, also a Local 751 union member, had a similar problem with Cleary in 2003. (Bach Aff., Exs. A & B.)  Mr. Waxman also wrote Cleary requesting information about his service credits and when he would become eligible for a pension. (Id.)  Like Diamond, Cleary frustrated Mr. Waxman's efforts to review his file and figure out the status of his benefits. (Id.)  There is some suggestion that Mr. Waxman's difficulties with Cleary were also driven by

---

[9] Argenzio honored Cleary's wishes out of fear that, if he did not, Cleary would make sure that Argenzio no longer got hired for jobs through the Union. (Id. 69:22-70:6.)

personal animus, as Mr. Waxman's February 2003 letter to Cleary refers to Cleary's "ongoing antipathy toward [Larry Waxman's] brother."[10] (Id.)

Unable to secure covered employment, and in reliance on Cleary's representations that Diamond had sufficient credits, Diamond filed an application for early retirement pension benefits on January 15, 1999. (Corello Aff., Ex. 4.)  By letter dated January 29, 1999, Cleary, in his capacity as the Fund's Manager, denied Diamond's claim for early retirement benefits, based on its finding that Diamond only had 14.5 years of service credits, ½ credit short of eligibility.  (Id., Ex. 5.)

Diamond appealed the Plan's determination on a number of grounds, including failure to properly credit vacation pay in 1982 and 1998, failure to properly credit double shifts, failure to credit Diamond the 6 service credits accrued prior to 1972, and failure to credit certain jobs with covered employers.  In a series of letters, Fund counsel and the Trustees rejected all of Diamond's appeals.

As a Trustee and Manager of the Fund, Cleary took part in the appeal process.  For example, on June 13, 2003, Diamond's attorney submitted a letter to Ms. Corello documenting certain jobs that Diamond worked, but for which he was not given service credit.  Rather than research the information independently, Fund counsel consulted with Cleary about whether the jobs listed—Diamond's work at the Eugene O'Neill Theatre, Roosevelt and Yonkers Raceways and the West Side Tennis Club—should be counted. (Id., Exs. 31 & 33.)  Based upon Cleary's representations that the shows did not play as Diamond claimed and that the employers were not

---

[10] In fact, there is some suggesting that the Cleary-Waxman dispute eventually resulted in Cleary resignation as President of Local 751 and Manager of the Local 751 Pension Fund on November 3, 2003. (Argenzio Dep. 70:7-16.)

covered employers obligated to contribute to the Local 751 pension plan, Corello initially denied Diamond's request for additional service credits. (Id.)  There is no evidence that Fund counsel or the Trustees verified the accuracy of Cleary's facts before denying Diamond's claims.

Cleary's representations were not always accurate.  For example, Cleary told Fund counsel that Annie never played at the O'Neill Theater, when in fact Annie played at the O'Neill in the last quarter of 1981—in the Plan's 1982 year. (Corello Aff., Ex. 31; Diamond Aff. ¶ 80 & Ex. 16.)  When Diamond's attorney brought this error to the Funds attention, the Fund gave Diamond partial credit for the additional days of covered employment. (Diamond Aff., Ex. 16.)  But the Fund limited Diamond's credit to 42 days of covered employment for his work on Annie and 48 days of covered employment for his work on Little Me.  The Fund rejected Diamond's claim that he worked additional pre- and post-production days based on insufficient evidence that Diamond actually worked those days, even though Diamond submitted social security records suggesting that he worked in excess of the 90 days credited to him. (Corello Aff., Exs. 33, 34, Ex. 36; Diamond Aff., Ex. 15.)

In addition to the Annie and Little Me errors, a number of other errors and inconsistencies occurred on Diamond's appeal which suggest deficiencies in the Fund's factfinding process.  For example, the Fund originally gave Diamond credit for his work at the Yonkers and Roosevelt Raceways in 1982. (Corello Aff., Ex. 10.)  During the appeal process, when the Plan was forced to grant additional days for Annie and Little Me, the Fund then asserted that the Raceways were not members and took away the credit previously awarded for work at the tracks. (Id., Ex. 34.)  This change in position was based on Cleary's representations to Fund counsel that neither raceway was a covered employer. (See id., Ex. 33.)  At his deposition, Cleary changed his position again, affirmatively stating that Yonkers Raceway was a covered employer and Roosevelt Raceway

probably was, as well. (Cleary Dep. 134:13-135:4.)

Similarly, after first crediting Diamond for his work on the Stella Management Show at the Javits Center in 1998, the Fund later subtracted the days from Diamond's pension credit, insisting that Stella Show Management Co. was not subject to a collective bargaining agreement requiring it to contribute to the Fund. (Corello Aff., Ex. 29.)  After almost six years of appeals, however, and presented with a copy of a pension check signed by Dorothy Stella for Diamond's contribution, the Fund reversed its position and admitted that Diamond was entitled to two additional days of covered employment for the 1998 plan year based on his work at the Stella Show. (Id., Ex. 40.)  In the same letter, however, the Fund took away 5 days from Diamond's work at Radio City, citing as its reason the recent discovery that Diamond worked nine weeks at Radio City during the 1998 plan year, not ten weeks as the Fund had earlier given Diamond credit for. (Id.)  The Fund also failed to credit Diamond for three days of covered employment for holiday pay earned at Radio City, despite an obligation to do so under Department of Labor regulations. Finally, in January 2003 the Fund finally agreed that Diamond should be credited for the three holidays days. (Id., Ex. 29.)

On each occasion, the Fund appears to have gotten its information from Cleary, and there is no evidence that Fund counsel or the other Trustees ever independently researched or verified Cleary's facts.  When Diamond presented affirmative, and uncontestable, proof that he was entitled to the days—which Diamond could not always do since he was not in possession of collective bargaining agreements—the Fund would credit Diamond with the additional days. Simultaneously, the Fund deprived Diamond of any benefit occasioned by these changes, by subtracting days and hours from other work, so that Diamond's total days of covered employment always remained at less than 100 days for the 1982 plan year and less than sixty days for the 1998

plan year.

The Trustees denied Diamond's appeals for the last time on January 21, 2005. (Id.)
While Diamond has never gotten the early retirement benefits or normal pension that he believes he
is entitled to, he has received a vested pension from the Fund since reaching age 62 in January
2004. On February 8, 2005, Diamond filed this lawsuit against the Local 751 Pension Fund, the
Trustees of the Fund, and Robert Cleary, alleging erroneous calculation of benefits and breach of
fiduciary duty. Diamond seeks summary judgment to recover the early retirement benefits denied
to him by the Fund; Defendants move for summary judgment in their favor.

**DISCUSSION**

I. CLAIMS AGAINST THE FUND AND ITS TRUSTEES

Counts three through seven of Plaintiff's complaint are directed against the Local
751 Pension Plan and its administrators. Diamond sues the Fund pursuant to Section 502(a)(1)(B)
of ERISA, 29 U.S.C. § 1132(a)(1)(B), alleging that the Trustees of the Local 751 Pension Fund
incorrectly calculated his service credits when reviewing his application for early retirement
benefits, thereby denying him benefits to which he is entitled. Diamond alleges a number of errors
by the Trustees, including failure to properly credit vacation pay for the 1982 Plan Year, failure to
properly credit days worked for covered employers in 1982 and 1998, failure to apply a year of
vesting credit owed to him for the 1982 Plan Year, and failure to credit service years 1964 through
1972. Before the Court can assess the validity of these claims, the Court turns to the standard of
review applicable to claims for benefits under ERISA.

A. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court held that "a denial of
benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). Where the plan permits discretion by the plan administrator, the more deferential "arbitrary and capricious" standard applies. See id. at 114-15. Under this standard, a court called upon to review a denial of benefits must defer to the interpretations of the plan administrators, unless the interpretation is " without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995); see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1984) ("A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." (internal quotation marks and citations omitted)). "This scope of review is narrow," and the Court is "not free to substitute [its] own judgment for that of [the plan administrators] as if [it] were considering the issue of eligibility anew." Pagan, 52 F.3d at 442.

If the plan administrator had a conflict of interest, however, the arbitrary and capricious standard may not apply. According to the Second Circuit, where "the administrator was in fact influenced by a conflict of interest," meaning that the conflict actually "affected the reasonableness of the [administrator's] interpretation," de novo review is appropriate. Sullivan v. LTV Aerospace & Def. Co., 82 F.3d 1251, 1255, 1256 (2d Cir. 1996) (internal quotation marks omitted); accord Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92 (2000). The mere existence of a conflict of interest is not sufficient, by itself, to warrant stricter review. See Pulvers, 210 F.3d at 92. In the absence of sufficient evidence that a plan administrator's conflict of interest actually tainted his decisionmaking, a reviewing court must apply arbitrary and capricious review. See id. In such circumstances, the administrator's conflict of interest does not become irrelevant, but "must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S.

at 115; <u>accord</u> <u>Pulver</u>, 210 F.3d at 92; <u>Pagan</u>, 52 F.3d at 442.

The Local 751 Pension Plan gives the Trustees of the Plan "the exclusive right, power and authority in its sole discretion to administer, apply and interpret the Plan . . . and to decide all matters that arise in the operation and administration of the Plan." (Corello Aff., Ex. 1, at D 000040.)  Under this language, the Trustees' decision to deny Diamond benefits under the Plan would ordinarily be subject to arbitrary and capricious review.  There is substantial evidence in this record, however, that Cleary allowed his personal animus towards individual plan members—Diamond included—to infect his official duties, as Union President and Plan Manager. The record contains deposition testimony from a hiring agent that Cleary prevented Diamond from gaining covered employment, letters from a fellow union member documenting Cleary's efforts to prevent him from viewing his pension records, letters from Diamond suggesting that Cleary also tried to prevent him from viewing pension-related record, and a letter in which Cleary brags to Fund counsel that he "blitzed" Diamond with "superfluous" records in response to Cleary's repeated requests for documentation. (Bach Aff., Exs. A-C; Diamond Aff., Ex. 5-6, 8, 11.)  The record also contains evidence Cleary repeatedly represented that jobs that Diamond worked did not actually exist or were not covered employment.  These representations were inaccurate, and consistent only in the adverse impact they had on Diamond.  None of Cleary's decisions ever worked in Diamond's favor.

There is strong evidence that Cleary's conflict of interest tainted every stage of the deliberative process, from Diamond's original application for early retirement benefits to the final stages of appeal.  The record is replete with errors and inconsistencies raising doubt about the integrity of the Fund's factfinding, which paid unwarranted deference to Cleary's unsupported "say so," as to which employers were subject to collective bargaining agreements and what days

Diamond actually worked.  (See, e.g., Corello Aff., Exs. 31, 33, 41.)

No evidence suggests the Trustees undertook an independent investigation of the facts at any time, even when doing so would have proven Cleary's factfinding wrong.  They did as Cleary suggested, and after Cleary departed, they continued to erroneously adhere to earlier, incorrect determinations.  Most notably, Cleary's erroneous representation that Annie did not play at the Eugene O'Neill Theater in 1981 nearly cost Diamond 42 (or more) days of covered employment.  Rather than investigate the simple facts, the Fund was content to defer to Cleary's statement.  Only after Diamond's attorney proved the Fund wrong—by reference to a publicly available web site that the Trustees could have checked at any time—did the Fund reluctantly admit the error.  As the Court already noted in the background section of this opinion, many of Cleary's other factual interpretations were affirmatively refuted or otherwise discredited; in some instances by Cleary's own subsequent deposition testimony.  The numerous errors suggest a dereliction of duty throughout the decisionmaking chain, which begins with Cleary's misrepresentations or inaccurate statements and ends with their unchallenged acceptance by the Fund's directions.

The repeated errors and contradictions in the Fund's claims review process evidence a process so seriously flawed that deference to the Trustees' interpretations is not appropriate here.  The grant or denial of benefits, which employees work decades to earn, cannot rise and fall on the made up "say so" of one conflicted administrator.  This is the very definition of capricious.  As the Second Circuit has recognized, "[w]hen an administrator is conflicted, . . . plaintiffs are utterly helpless against the whim of its interpretation of the facts." 389 F.3d 288, 294 (2d Cir. 2004).  As fiduciaries, the Trustees had a duty to accurately determine the hours of service which Diamond

was owed.[11] See 29 U.S.C. § 1059; 29 C.F.R. § 2530.200b-3.  The Trustees' failure to do so is an

abuse of the discretion granted to them by the language of the Plan, thereby raising significant

doubt as to whether the Court should accord any deference to their discretion at all.  As such, the

Court believes de novo review is appropriate in this case.[12]

B.  1982 Plan Year

The Fund credited Diamond for ninety-five days of covered employment during the

1982 Plan Year, five days short of what was needed for a full year of service credit.  Diamond

alleges that the Fund miscalculated the number of days of covered employment for the 1982 Plan

Year resulting in the erroneous denial of Diamond's benefits.  The Court will address each

argument separately.

1.  Work at the Yonkers and Roosevelt Raceways

Notwithstanding the Trustees' later representations that neither Yonkers Raceway

nor Roosevelt Raceway were covered employers, the Fund originally gave Diamond credit for his

work at both locations.  In a May 3, 1999 letter, Fund counsel stated that, according to Diamond's

record card, Diamond "worked one day a week for weeks ending March 13 - April 2 and April 17,

---

[11] Under Department of Labor Regulation 2530.200b-3, a plan administrator may use any records to
determine hours of service to be credited to employees under a plan. 29 C.F.R. § 2530.200b-3(a).  If
adequate records are unavailable, the plan administrator may use an equivalent method, such as
computing hours of service owed based on the earnings records, days of employment, shifts worked, etc.
See id. § 2530.200b-3(a),(d), (e), (f).  Whatever method is chosen must result in the crediting of no less
than the actual number of hours of service for which an employee is paid for the performance of duties.
See id. § 2530.200b-3; 29 C.F.R. § 2530.200b-2(a)(1).  Thus, assuming as a default position that no credit
is owed to an employee, even where the employee proffers records to the contrary, as the Local 751
Pension Fund's Trustees appear to have done in this case, is not an acceptable option.

[12] The Court is unsure what records, if any, the Trustees relied upon to make their factual determinations,
as the Fund has not submitted these records to the Court.  The Court's review of the letters and meeting
minutes submitted by Defendants in support of their position shed little light.  Therefore, the Court will
draw from all permissible sources submitted to the Court to calculate Diamond's days of covered
employment.

1982," for a total of five days of covered employment. (Corello Aff., Ex. 10.)  These five days

match Diamond's social security records. (Diamond Aff., Ex. 15.)  According to those records,  he

worked four days at Yonkers Raceway in March 1982 and one day at Roosevelt Raceway in April

1982; he did not work at the Eugene O'Neill Theater during this time. (Id.)  There is only one

conclusion:  whoever originally prepared Diamond's record card believed the Yonkers and

Roosevelt Raceways were covered employers and gave Diamond credit for these days.  Three years

into Diamond's appeal, Fund counsel said the five days were uncovered; and the only explanation

was that the original crediting of these days was in error. (Corello Aff., Ex. 34.)  This shift in

position is both mysterious and suspicious, especially in light of Cleary's deposition testimony that

both employers would have been covered by collective bargaining agreements requiring them to

contribute to the Fund. (See Cleary Dep. 134:13-135:4.)  Accordingly, the Court believes that

Diamond is entitled to five days of covered employment for his work at these two locations.

### 2. Work at the Eugene O'Neill Theater

#### (a) Failure to properly credit days worked at the Eugene O'Neill Theater

The Fund gave Diamond ninety days of credit for his work at the Eugene O'Neill

Theater.  In her May 3, 1999 letter, Fund counsel stated: "Mr. Diamond's record card shows that . .

. [h]e worked six days a week for weeks ending October 24 - December 5, 1981 and January 2 -

February 20, 1982 (15 weeks)." (Corello Aff., Ex. 10.)  These weeks match precisely the weeks that

Annie and Little Me played at the Eugene O'Neill Theater. (See Diamond Aff., Ex. 16.)  Therefore,

it is now uncontested that Diamond worked these weeks, and since the labor contract calls for a six-

day work week, Diamond worked six days per week during this period, for a total of 90 days.

Diamond claims an additional 27 days for pre and post production work at the

Eugene O'Neill Theater.  (See Diamond Aff. Ex. 15.)  Diamond's social security records support

this claim for additional credits.[13]  According to Diamond's records, his total earnings from the Eugene O'Neill Theater during the 1982 plan year were $9,954.74. (Id., Ex. 15.)  The collective bargaining agreement calls for a weekly salary of $504.77.  If this salary is increased by six percent, to account for the vacation allowance given to box office employees in accordance with the collective bargaining agreement, Diamond's total weekly wages were approximately $535.06. (Bach Aff., Ex. E.)  Dividing Diamond's total earnings by the weekly wage results in 18.6 weeks of employment, not 15 weeks of employment.  At a six day work week, this entitles Diamond to approximately 21.6 additional days of covered employment.

The Trustees rejected this proposed method of calculating Diamond's days of work as inappropriate "because it does not recognize that there is often premium pay in a particular week." (Corello Aff., Exs. 36 & 41.)  The Fund, however, did not propose an alternative calculation methodology or suggest what the impact of premium pay would be.  If the Fund is correct that Diamond worked only fifteen weeks, then Diamond must have earned approximately $663.65 per week ($9954 ÷ 15 weeks) or approximately $128.59 more than weekly wage, plus vacation pay. No conceivable calculation of premium pay could support this differential.[14]

Based on these calculations, the Court concludes that Diamond must have worked more than ninety days.  Further, the Court accepts as reasonable Diamond's suggested calculation method:  divide Diamond's total earnings by 106% of the weekly wage, and then multiply the

---

[13]  Diamond's claim is also supported by the applicable labor contract.  Subsection (m) of the agreement mandates that during the two weeks immediately preceding the first performance, the theater must maintain a minimum box office staff for advanced ticket sales. (Bach Aff., Ex. E.)

[14]  The contract calls for 1/6 or 1/8 additional pay for Sundays, midnight performances or additional performances and time and a half for an employee working over forty hours.  At these rates, it would have been almost impossible for Diamond to earn such a large amount of additional wages, without working additional days.

resultant by six days per week ($\underline{9954} \times 6 = 111.6$)

$$\left( \ 1.06 \times \$504.77 \qquad \right).$$

Using this method of calculation, Diamond worked approximately 111.6 days of covered employment at the Eugene O'Neill Theater during the 1982 Plan Year. No calculation of premium pay could reduce this figure below 100 days.

> *(b) Failure to properly credit paid vacation earned while working at the Eugene O'Neill Theatre*

The Court rejects Diamond's argument that he should have received credit for vacation pay. Diamond was paid a premium in his salary to account for his vacation time. This does not entitle him, however, to additional hours of covered employment for purposes of benefit accrual, because "the payment was not made on account of a period during which no duties were performed." 29 C.F.R. § 2530.200b-2(b)(3)(ii)(A). The Plan's interpretation is the most reasonable interpretation of the regulation. Accordingly, Diamond is not entitled to additional days of covered employment on the basis of paid vacation time accrued while working at the Eugene O'Neill Theater.

> *3. Work at the West Side Tennis Club*

Because the Court believes that Diamond's work for the Eugene O'Neill Theater brings his total days of covered employment above the 100 days necessary to a full year of service credit, the Court finds it unnecessary to resolve this claim.

C. 1998 Plan Year

The Fund credited Diamond with fifty-five days of covered employment during the 1998 Plan Year, five days short of the necessary work for one-half year service credit. As with the 1982 plan year, Diamond alleges that the Fund miscalculated the number of days of covered employment to which he is entitled.

*1. Work at Radio City Music Hall*

The Fund originally credited Diamond with ten weeks of employment at Radio City during the 1998 plan year. The Fund then multiplied ten weeks by five days per week, or fifty days of covered employment. The Fund later admitted that Diamond was entitled to an additional three days of covered employment for paid holidays that Diamond did not work. Diamond challenges this calculation, arguing that he should be credited six days of covered employment for each week he worked at Radio City, not five, for a total of sixty days. The Court agrees with Diamond, though for different reasons than those advanced by Diamond on appeal to the Trustees and in his opposition papers to this Court.[15]

The collective bargaining agreement between Radio City and Local 751 expressly states that "the work week shall consist of forty (40) hours in six (6) days," with overtime paid only when an employee works more than forty hours or more than six days in one week. (Diamond Aff., Ex. 14.) Further, the agreement calls for payment of pension contributions by percentage, with Radio City paying "eight percent (8%) of the gross weekly salaries of Treasurers, Assistant Treasurers and Ticket Sellers" to the Fund. (Bach Aff., Ex. G.) In accordance with this payment schedule, an employee would get the same salary, and Radio City would pay the same contribution, regardless of whether an employee worked forty hours in six calendar days or five. Thus, it makes no sense to calculate service credits according to the number of calendar days worked by the employee, without any consideration of the number of hours in each calendar day. Doing so

---

[15] Diamond argues that Radio City scheduled its labor in shifts, and therefore the proper method of calculating hours of service owed to plan participants is by the shift method, as permitted by Department of Labor Regulation 2530.200b-3(e)(2). In counting credits by the shift method, a plan must give an employee additional service credit if he works an additional shift. See 29 C.F.R. § 2530.200b-3(e)(3)(vii). Thus, Diamond is entitled to 2 days of covered employment for each day that he worked a double shift. Because the Plan calculates service credits according to calendar days, however, not according to shifts (see Corello Aff., Ex. 1, at D000053), it is not clear that the shift rule should apply. Compare 29 C.F.R. § 2530.200b-3(e)(1)(I), with 29 C.F.R. § 2530.200b-3(e)(2), (e)(3).

arbitrarily disadvantages employees who work longer hours each calendar day, and therefore complete a forty-hour work week in less than six days. While these employees would have worked the same number of hours as their counterparts with shorter shifts spread out over more days, earned the same salary, and had the same contribution paid in by the employer, they would earn less pension credits. Such arbitrary computation of credit is unreasonable.

Department of Labor regulations further support this determination. Regulation 2530.200b-3 gives plan administrators a great deal of flexibility in calculating the hours of service that must be credited to employees. See 29 C.F.R. § 2530.200b-3(a). Plan administrators may compute hours of service owed to a participant according to working time, periods of employment (e.g., days of employment or shifts), earnings, or any combination of the three, as long as the method "results in the crediting of no less than the actual number of hours of service required to be credited under [DOL Regulation] 2530.200b-2(a)." 29 C.F.R. § 2530.200b-3(d)-(f). DOL Regulation 2530.200b-2(a) requires that an employee be credited "for each hour for which an employee is paid . . . for the performance of duties." 29 C.F.R. § 2530.200b-2(a)(1). Giving some employees six days of credit for forty hours of work, while giving other similarly situated employees five days of credit for the same forty hours of work does not comport with this requirement. The Fund's chosen method of computation—calendar days, regardless of number of hours or shifts worked in each calender day—not only denies employees pension credit for hours worked, in violation of applicable regulations, it also creates arbitrary disparities between employees. The Court cannot permit this.

The question then becomes how to remedy this error in computation. Members of the Local 751 Pension Fund earn service credits by accruing days of covered employment. (See Corello Aff., Ex. 1, at D000053.) Thus, whatever method of computation is used must accurately

convert hours worked into days of covered employment. There are two possibilities to reconcile this requirement with the language of the collective bargaining agreement between Radio City and Local 751:

(1) Because the collective bargaining agreement calls for a "work week consisting of forty (40) hours in six (6) days," the Plan could credit Diamond with six days for each forty hour work week. According to Radio City records, this would give Diamond at least seven additional days of covered employment (<u>see</u> Diamond Aff., Ex. 14).

(2) The collective bargaining agreement also states that no employee should work more than "eight (8) hours in any one calendar day." (Bach Aff., Ex. G.) Thus, another possible method of computation would be to treat a calendar day as 8 hours, as if calculating hours of service on the basis of shifts. Under this method, an employee would be entitled to an additional day of covered employment for each day that he worked above the 8-hour limit. <u>See</u> 29 C.F.R. § 2530.200b-3(e)(3)(vii) (explaining that if the workday of an employer is scheduled in shifts, and, in addition to his normal 8-hour shift an employee works one hour into the next shift, the employee must be credited with at least one hour of service for the second shift). Thus, every time Diamond worked a double shift, he would be entitled to two days of covered employment.

Either method would puts Diamond's total days of covered employment for the 1998 plan year above the 60 days required to earn ½ a service credit.[16]

*2. Work for Stella Show Management Co. (Stella Show at the Javits Center)*

Eventually, Fund counsel admitted that Diamond's work at the Stella Show constituted "covered employment." (Corello Aff., Ex. 40.) Accordingly, Diamond is entitled to two

---

[16] Diamond only submits scheduling sheets for seven weeks at Radio City. While there is no doubt that Diamond worked more than seven weeks at Radio City, because the Court only has proof that Diamond worked a full forty-hour week, or double shifts, on seven different weeks, the Court will give Diamond the additional credit only for seven weeks. While the Plan originally credited Diamond with ten weeks of employment at Radio City, it later reduced this amount to nine weeks. This sudden shift in position in a letter dated January 21, 2005 is totally unsupported by the record. From the time Diamond originally appealed in 1999 until January 2005, the Fund consistently maintained that Diamond was entitled to credit for ten weeks of work at Radio City, and therefore the Court will hold the Fund to this representation. If Diamond worked three weeks at five days per week + seven weeks at six days per week, he is entitled to fifty-seven days of covered employment. In addition, Diamond has three days of vacation time for days not worked, giving him a total of 60 days of covered employment at Radio City.

days of covered employment for his work at the Stella Show during the 1998 plan year.

The combination of the Radio City and Stella Show calculation gives Diamond at least 62 days and, accordingly, he has earned one-half years service credit.

D. Break in Service Rules

Diamond argues that the Fund's application of the break in service rules deprive him of the vesting and service credits he earned prior to 1982. In support of this argument, Diamond points to Section 2.4(d) of the Plan language, which states that once an employee accumulates fifteen years of service credit, the Section 2.4(a) break in service rule does not apply. (See Corello Aff., Ex. 27.) The Court rejects this argument. The Trustees did not apply the Section 2.4(a) break in service rule to Diamond's case; instead, they correctly applied Section 2.6's permanent break rule, which provides:

> An Employee sustains a Permanent Break if he has consecutive One-Year Breaks, including at least one after the Fiscal Year ending August 31, 1976, that equal or exceed the number of his years of Vesting Credit . . . If an Employee who has not achieved Vested Status, as defined in Section 2.7, incurs a Permanent Break, his previous Vesting and Service Credit shall be deemed cancelled for all purposes and he shall cease to be a Participant under this Plan.[17]

(Corello Aff., Ex. 1.) Diamond earned six service and vesting credits prior to 1973, which is not enough to earn Vested Status. Diamond earned no credits during the nine-year period that he lived in Los Angeles, California, thereby resulting in nine one-year breaks for the plan years 1973-1981. Diamond sustained a permanent break because nine one-year breaks exceeds the six years of Vesting Credits earned prior to 1973.

The only possible exception that could apply in Diamond's case is Section 2.7, but it

---

[17] While Section 2.6 contains two exceptions, neither applies in Diamond's case.

is not applicable to Diamond. Section 2.7 was meant to apply to future permanent breaks (i.e., those occurring after the employees achieves vested status), not past permanent breaks. This reading of Section 2.7 is consistent with the language of Section 2.6(b): "If an employee who has not achieved Vested Status . . . incurs a Permanent Break, his previous Vesting and Service Credit shall be deemed cancelled." An employee must achieve vested status, prior to a permanent break in order to keep his credits. Diamond does not fit this category of employees, and therefore is subject to the Section 2.6 permanent break rule.

Diamond's argument that Section 2.6 does not apply to his case because it applies only to permanent breaks after plan year 1976, and his permanent break occurred prior to 1976 is unconvincing. Diamond's permanent break took effect after August 1, 1976, when he incurred six one-year breaks in service.[18] Section 2.6 controls Diamond's case.

## II. CLAIMS AGAINST ROBERT CLEARY

Diamond brings two claims against Robert Cleary. In view of the Court's previous findings that Diamond actually accrued 15.5 service credits prior to reaching the age of early retirement, Diamond's Section 404 and 510 claims against Cleary are superfluous. Accordingly, the Court declines to address these claims.

## CONCLUSION

Defendants' motion for summary judgment is DENIED. Plaintiff Stuart Diamond's cross-motion for summary judgment is GRANTED in part. The Court finds that the Trustees of the Local 751 Pension Fund erroneously calculated the number of days of covered employment to which Diamond was entitled for the 1982 and 1998 plan years. Diamond is entitled to one full

---

[18] Under Section 2.6 of the Plan, an employee suffers a permanent break when his consecutive one-year breaks are equal to or more than the number of vesting credits previously earned. Thus, Diamond suffered a permanent break at the end of plan year 1978, when he had six consecutive one-year breaks.

service credit for the 1982 plan year, and a half year of service credit for the 1998 plan year, bringing his total service credits to 15.5. Accordingly, Diamond was entitled to early retirement benefits as provided for by the language of the Local 751 Pension Plan.

The Treasurers and Ticket Sellers Local 751 Pension Fund is hereby ORDERED to credit Diamond with 15.5 years of service credits and award Diamond his early retirement pension retroactive to February 1, 1999, with interest. The Fund is also ORDERED to pay to Diamond all other compensation or benefits that he may be entitled to receive under the language of the Plan as a result of this increase in his service credits. In all other respects, Plaintiff's motion is denied.

Dated: New York, New York
        August 22, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge